NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

| | | |
|---|---|---|
| CARLOS LOPEZ, | ) | |
| Appellant, | ) | |
| v. | ) | Case No. 2D11-3091 |
| STATE OF FLORIDA, | ) | |
| Appellee. | ) | |
| MANUEL PIZARO-MAYSONET, | ) | |
| Appellant, | ) | |
| v. | ) | Case No. 2D11-3095 |
| STATE OF FLORIDA, | ) | |
| Appellee. | ) | |
| CARLOS COLORADO, | ) | |
| Appellant, | ) | |
| v. | ) | Case No. 2D11-3153 |
| STATE OF FLORIDA, | ) | |
| Appellee. | ) | |

JASON BURGOS,                    )
                                 )
          Appellant,             )
                                 )
v.                               )          Case No. 2D11-3412
                                 )
STATE OF FLORIDA,                )
                                 )
          Appellee.              )
_____ )

Opinion filed August 15, 2014.

Appeal from the Circuit Court for
Hillsborough County; William Fuente,
Judge.

Joseph J. Registrato, Tampa, for Appellant
Carlos Lopez.

Edward M. Abel, Spring Hill, for Appellant
Manuel Pizaro-Maysonet.

Ryan Thomas Truskoski of Ryan Thomas
Truskoski, P.A., Orlando, for Appellant
Carlos Colorado.

Jorge Leon Chalela of Jorge Leon Chalela,
P.A., Tampa, for Appellant Jason Burgos.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Elba Caridad Martin-
Schomaker, Assistant Attorney General,
Tampa, for Appellee in case numbers
2D11-3091, 2D11-3153, and 2D11-3412.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Sonya Roebuck Horbelt,
Assistant Attorney General, Tampa, for
Appellee in case number 2D11-3095.

- 2 -

ALTENBERND, Judge.

Carlos Lopez, Manuel Pizaro-Maysonet, Carlos Colorado, and Jason Burgos appeal their judgments and sentences arising from their involvement in a heroin importation and distribution network that connected Puerto Rico and Florida. They were tried together. Although their appeals were filed separately, we have consolidated the appeals for purposes of this opinion. We affirm Mr. Colorado's judgment and sentences. However, a double jeopardy issue affects the judgments for the other appellants. We thus reverse their judgments, in part, and remand with instructions. We discuss one of the issues on which we affirm.

## I. THE COURTROOM USE OF WRITTEN TRANSLATIONS OF INTERCEPTED SPANISH LANGUAGE TELEPHONE CALLS CREATED BY A TEAM OF POLICE OFFICERS DURING A CRIMINAL INVESTIGATION

A. The Facts and Proceedings in the Trial Court

Through the use of confidential informants and wiretaps, the Tampa Police infiltrated a RICO enterprise that operated over a period of months in 2009. The enterprise was importing heroin from Puerto Rico into Florida. The enterprise included suppliers in Puerto Rico, transporters who delivered the drugs to Florida, and persons involved in the sale and distribution of the drugs in Florida.

When the information was initially filed, there were nineteen defendants. Several of those defendants negotiated pleas under which they testified at the defendants' trial. In addition to this evidence, the State relied on recorded telephone calls among the members of the enterprise. During the course of the investigation, the police recorded over 12,000 telephone conversations, but only about 100 of the recorded telephone calls were introduced into evidence.

- 3 -

The proper method to introduce these recorded telephone calls was an issue in this case from its inception. The participants in the telephone calls spoke primarily in a Puerto Rican dialect of Spanish. The Tampa Police Department had a team of officers in a location where all of the calls were intercepted. These officers were fluent in Spanish. For example, the lead officer had been raised until middle school in Puerto Rico. A second officer who testified at trial also had been raised by a family from Puerto Rico, and the members of that family had spoken Spanish in the home. The officers also had considerable experience with drug sales and trafficking. They worked collectively, listening repeatedly to the recordings, to learn the identity of the speakers and create translations.

Long before the trial in this case, the State produced the Spanish recordings and a document that included Spanish transcripts of the critical calls side-by-side with the officers' translations of the calls into English. The transcripts did not always identify the speaker, contained indications that short sections were sometimes inaudible, and used occasional Spanish words that apparently were not subject to translation.

The court held several hearings on the question of how to use these recordings and transcripts at trial. The defendants argued that no translation could be introduced unless a translator who was an independent official translator was sworn pursuant to section 90.606, Florida Statutes (2008), and testified that the transcript was a true interpretation of the telephone calls. The State disagreed. It had hired a Spanish language interpreter and court reporter to translate a few of the more difficult calls but

had concluded that an independent translation of the extensive recorded conversations among unidentified speakers would be cost prohibitive.

Ultimately, the trial court allowed the State to introduce into evidence the recorded telephone calls in Spanish, which calls were preserved for the record on a digital disc. They were introduced after the lead officer provided the necessary predicate evidence. These calls were played to the jury during the testimony of various witnesses. When played, each call was identified in a manner that allows for a review of the recorded call on the digital copy. The recorded calls were not allowed into the jury room. Instead, the jury was told that it could ask for a call to be replayed during deliberations, which it did for three calls.

The Spanish-to-English transcripts of these calls were not introduced into evidence. The lead officer presented testimony concerning their creation and confirmed under oath that he personally had listened to each recording and that the Spanish transcriptions and English transcripts were, in his opinion, accurate. A second officer provided similar testimony. Thereafter, the jury was allowed to refer to the transcripts as the Spanish calls were played in the courtroom. The two officers referred to the transcripts in their testimony, essentially to refresh their recollection of the recordings and translations. Neither officer was sworn as a translator. The court did not inform the jury that these translations were "official" in any sense.

Prior to the Spanish recordings being played for the jury, the jury was given an instruction for disputed translations that is comparable to Florida Standard Jury Instruction (Criminal) 2.11. The following instruction was read to the jury:

> Members of the jury, you are about to listen to tape
> recordings that were made in Spanish. Each of you in a

moment will be given a transcript of that recording. The transcripts that are going to be provided to you by the State——I'm sorry, they are being provided to you by the State so you can consider the content of the recordings, and that's because that—what you are going to hear is in Spanish, and the State will proceed accordingly.

The transcript that you will receive is an English translation of the foreign language, that is, a Spanish tape recording. Now, whether a transcript is an accurate translation in whole or in part is for you to decide.

In considering whether a transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you as regarding how and by whom that transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation, and the reasonableness of the translation in light of all the evidence in the case.

You should not rely in any way on any knowledge you may have of the Spanish language on the recording. Your consideration of the transcripts should be based on the evidence introduced at trial. And so that you will know, as you are making your notes, that these transcripts are being given to you as an aid. They will not be going back to you with the evidence when you go back to deliberate.

During the trial, the State presented extensive testimony from other members of the enterprise who had already pleaded guilty. One was an older man who had been addicted to heroin at the time of these events. He testified without the aid of an interpreter. He identified his own voice and those of members of the enterprise on recordings that were played during his testimony. The recordings were conversations, according to the witness, discussing the purchase of heroin. Some of these recorded conversations were in English, including calls with Carlos Lopez. The court reporter recorded and transcribed the calls that were in English.

A second witness, who also testified without an interpreter, was primarily a seller of heroin in Florida. He described the sales process. Several recordings were

played during his testimony. For each recording, he would identify himself and others on the calls and explain the nature of the conversations. He also identified a photograph of Carlos Colorado in a car with him at a convenience store, which he testified was a photograph of a delivery of heroin. He identified his own voice and that of Carlos Colorado on a recorded call in English in which Carlos Colorado was trying to buy heroin.

A third witness, who testified through an interpreter, was primarily a seller of heroin in Florida. He too testified to the process of obtaining, bagging, and selling the heroin. He identified his voice and that of others on recorded telephone calls, calls that he described as related to the sale of heroin. He was also allowed to identify other members of the enterprise on recorded calls in which he was not a participant. He did not translate those calls, but he did identify certain code words that were used on the calls as words relating to the sale of heroin.

Finally, two women testified that they were involved in the transportation of heroin from Puerto Rico to Florida. On one or more occasions, they flew this route with heroin inserted into their body cavities in sealed containers inside condoms. They testified regarding the persons involved on both ends of the transportation. The two women had been arrested in Florida while transporting the heroin as passengers in a car driven by Carlos Lopez.

Following this testimony, the State presented the lead investigating officer. During his testimony, the State played many recordings. The officer testified to the content of the recordings, relying on transcripts. As explained earlier, the jury was allowed to view the transcripts during his testimony, but the transcripts were not

introduced into evidence and, thus, were not exhibits that could be used by the jury during deliberations. The officer testified concerning code words in the recorded telephone calls that were used in lieu of more incriminating terms, consistent with the earlier testimony from the other witnesses.

It is important to note that the defendants had ample time and opportunity to review the translations. Although they questioned whether the speakers were always properly identified, no defendant made any serious argument that the translations were inaccurate. One defendant admitted prior to trial that he had no objection to the quality of the translations. The defendants all had the right to cross-examine the officers as to the accuracy of any portion of the translations, but they limited their cross-examination primarily to issues of potential bias. Several of the defendants did not cross-examine the lead officer. They had the right to call a witness who spoke fluent Spanish to challenge any portion of the translations, but they did not. On a number of occasions during the case, they appeared to rely on the accuracy of the translations to prove some point favorable to a defendant.

B. The Failure of the Court Reporter to Record and Transcribe the Spanish Telephone Calls

At least one of the defendants argues that we must reverse because the court reporter did not record and transcribe the Spanish language telephone calls that were played during the trial. When this case initially was submitted to this court, the appellate record did not contain the digital copies of the recorded telephone calls. Thus, the issues submitted to this court concerned conversations played to the jury that were unavailable to this court—even though none of the judges reviewing this case would be competent to translate those calls.

This court ordered the record to be supplemented with a copy of the digital recordings. We did this not to confirm the accuracy of the transcriptions and translations, but to confirm that the proceedings in the trial court, a court of record, were in fact reviewable. They are.

The court reporter obviously did not record these telephone calls as they were played to the jury because the reporter was not trained or competent to do so in a language other than the official language of the court. We conclude that the holding in Greene v. State, 795 So. 2d 94, 98 (Fla. 4th DCA 2000), requiring a court reporter to make a good faith effort to record and transcribe recorded testimony, is not applicable to foreign language recordings. The record of proceedings must be preserved to the extent feasible, but the court reporter simply cannot be the method for making the record in this situation.

Rather like a photograph or other exhibit given to a jury during a trial, the court reporter could only report with accuracy the events taking place in the courtroom. The transcription in this case identifies when each recording is played, and the attorney presenting the evidence identifies the recording by its date, time, and specific recording number. This seems to this court to be an adequate method for a court of record to preserve its proceedings.[1] In this case, the trial was conducted by a very experienced trial court judge, and we comment on this procedure primarily to encourage other judges to be as meticulous in handling this problem as was the judge in this case. The

---

[1]There is no suggestion in this record that the jury was presented with portions of these recordings as compared to the entire telephone call identified on the digital copy. In a case where a jury received only an excerpt from a foreign language recording, additional steps may be necessary to preserve the record accurately.

omission of the Spanish conversations from the court reporter's transcript is not an error in this case.

C. The Procedures Involved in the Use of the Spanish-to-English Transcripts

Before the end of the trial, the trial judge began commenting on the record to the attorneys that there must be a better way to handle the issue of how to use the transcripts in this case. Because the defendants had not stipulated to the document or offered a competing document—and we do not suggest that they were obligated to do so—the process of playing and using these recordings resulted in a constant supply of objections from the defendants. We suspect that the trial court may be correct that a better method exists, but we are not prepared to propose such a method. We only conclude that the method used was not an abuse of discretion by the trial court to the extent that the issue involves discretion and that it was not an error of law in this case.

The procedural safeguards used by the trial court in this case are somewhat similar to those used in Fernandez v. State, 21 So. 3d 155, 156-57 (Fla. 4th DCA 2009). In this case the court did not place the transcripts into evidence, and the jury was allowed to evaluate them only in the courtroom. Outside the presence of the jury, the judge required the lead officer to testify that the documents represented accurate translations. The judge also considered extensive evidence as to the lead officer's experience and competence in Spanish, as well as the team method by which the translations were created. The trial judge essentially made a gatekeeper decision that the translations were of sufficient quality and that their accuracy should be a jury question under the new instruction. Thereafter, the two key participants in the creation of the transcripts were presented for full confrontation in front of the jury, even if the

- 10 -

defendants conducted a limited confrontation. The recorded telephone calls were often presented to the jury by witnesses who were parties to those conversations. The officers were not sworn as translators in front of the jury, which only would have bolstered their credibility. Under the recently created standard jury instruction, see Fla. Std. Jury Instr. (Crim.) 2.11, the jury was told not to use their own language skills and to assess from the testimony the skills of the officers who created the documents.

Although the procedural safeguards used here were somewhat similar to those used in Fernandez, it is important to explain that the witness in Fernandez was not one of the police officers investigating the case. In Ortega v. State, 721 So. 2d 350, 351 (Fla. 2d DCA 1998), this court held that a police officer should not be allowed to translate a defendant's statements. In that case, the officer apparently provided a summarized translation on a videotape as the defendant was providing his statement to the police. Id. at 350-51. The videotape was played for the jury as the officer was allowed to provide a more detailed translation at trial. Id. at 351. Although Ortega has not been followed in at least one other state,[2] we continue to believe that allowing an officer who is so directly involved in an arrest or interrogation to provide a quick translation on such a videotape or to be a translator at trial is bad practice and unnecessary. In a case like Ortega, the State could readily obtain a translation of the videotape of the one known witness from a highly qualified translator, who could be sworn as such in court. In this case, even limited to the 100 most relevant recordings, the process of obtaining a translation of coded drug-related telephone calls involving unidentified speakers would be very difficult. Under the current jury instruction, we

---

[2]See, e.g., People v. Munoz-Casteneda, 300 P.3d 944, 949-50 (Colo. App. 2012).

conclude that a trial judge has the discretion, with a proper predicate, to make translations like the ones in this case an issue of disputed translation for resolution by the jury.

The final question presented by the defendants as to this issue is whether the State can prove a prima facie case in this context without an "official" translation. Candidly, we are not certain that anything in the law requires an "official" translation. Indeed, in a criminal case, providing such a translation would put an imprimatur upon the document that could only be harmful to the defendant.

The concept of an official translation emanates from section 90.606, which governs the use of interpreters and translators in courtrooms. Interpreters assist witnesses and parties in understanding proceedings that take place in the courtroom. The services of one or more interpreters were employed in this case to assist at least one defendant and some of the witnesses. A translator can be used to translate foreign language evidence including contracts and other documents that will be submitted to the jury as evidence.

Admittedly, it might be feasible to employ a translator to deal with recorded conversations of this sort. But the expertise to translate such telephone recordings obtained by wiretap is very different from the process of translating a legal contract, a letter, or even the testimony of a known witness in a foreign-language legal proceeding.

We conclude that, subject to the safeguards discussed in this opinion, the State is not compelled to obtain translations by an independent translator if its own

agents can present the predicate evidence necessary to satisfy the judge that the accuracy of the translations is a matter for the jury to decide.

## II.  DOUBLE JEOPARDY

Consistent with our opinion in <u>Mathes v. State</u>, 106 So. 3d 73 (Fla. 2d DCA 2012), we conclude that three of the four defendants' rights against double jeopardy were violated when they were convicted of multiple conspiracy offenses stemming from a single conspiracy with multiple objectives.  <u>See</u> <u>Negron Gil de Rubio v. State</u>, 987 So. 2d 217, 219 (Fla. 2d DCA 2008).  The State concedes this point on appeal.

A.  <u>Mr. Lopez</u>

Mr. Lopez was convicted of (1) racketeering, (2) trafficking in illegal drugs, (3) conspiracy to traffic in heroin (4 to 14 grams), and (4) conspiracy to traffic in heroin (28 grams to 30 kilograms).  He was sentenced to concurrent terms of thirty years' imprisonment for each offense.  The higher conspiracy-to-traffic-in-heroin charge drew a twenty-five-year minimum mandatory sentence.  The lower conspiracy-to-traffic-in-heroin charge drew a three-year minimum mandatory sentence.  We reverse only Mr. Lopez's judgment and sentence for conspiracy to traffic in heroin (4 to 14 grams), which resulted in the three-year minimum mandatory sentence.

B.  <u>Mr. Pizaro-Maysonet</u>

Mr. Pizaro-Maysonet was convicted of (1) racketeering, (2) conspiracy to commit racketeering, and (3) conspiracy to deliver heroin.  He was sentenced to concurrent terms of ten years' imprisonment for the offenses of racketeering and conspiracy to commit racketeering.  He received a concurrent sixty-month prison

sentence for the conspiracy to commit delivery of heroin offense.  We reverse Mr. Pizaro-Maysonet's judgment and sentence for conspiracy to deliver heroin.

C.  <u>Mr. Burgos</u>

Mr. Burgos was convicted of (1) racketeering, (2) conspiracy to commit racketeering, and (3) two counts of conspiracy to traffic in heroin.  He was sentenced to thirty years' imprisonment for each conviction to run concurrently with one another.  We reverse both of Mr. Burgos's judgments and sentences for conspiracy to traffic in heroin.

On remand, the trial court shall strike the charges that are barred by double jeopardy.  All of the sentences for these three defendants appear to have been imposed using a Criminal Punishment Code scoresheet.  In each of these cases, the dismissal will alter the scoresheet that was used when sentencing for the remaining judgments.  Especially in Mr. Burgos's case, the reduction in the scoresheet should be substantial.  Accordingly, on remand the trial court shall arrange for the preparation of new scoresheets and conduct a hearing to determine whether revised sentences are appropriate for the judgments that we affirm.

Affirmed in part, reversed in part, and remanded with instructions.

NORTHCUTT and LaROSE, JJ., Concur.